**NOT RECOMMENDED FOR PUBLICATION**
File Name: 05a0243n.06
Filed: April 1, 2005

**NO. 03-4642**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| MIRALA NIKIS, | ) | |
|     *Petitioner-Appellant,* | ) | |
| | ) | ON APPEAL from the Board |
| v. | ) | of Immigration |
| | ) | Appeals |
| JOHN ASHCROFT, | ) | |
| Attorney General of the United States, | ) | |
|     *Respondent-Appellee*, | ) | |

**Before: MERRITT and ROGERS, Circuit Judges; HOOD, District Judge.**[*]

HOOD, District Judge. This is an appeal from a decision of the Board of Immigration Appeals ("BIA") affirming the immigration judge's decision to deny asylum, relief under the Convention Against Torture, and withholding of removal. As the petitioner only appealed the issue of denial of asylum, we only review that aspect of the decision. The BIA held that the immigration judge was correct in denying asylum because the petitioner's testimony was not credible and because the petitioner failed to connect alleged past persecution to an enumerated ground for asylum. Because we find that the BIA's decision was supported by substantial evidence, we **AFFIRM.**

**I. BACKGROUND**

---

[*]The Honorable Joseph M. Hood, United States District Judge for the Eastern District of Kentucky, sitting by designation.

On March 10, 2001, the petitioner/appellant, Mirala Nikis, a native of Albania, was stopped at the San Francisco airport because she sought admittance into the United States with the use of a fraudulent passport. The petitioner was fourteen at the time. Agents of the former Immigration and Naturalization Service ("INS")[1] interviewed the petitioner at the airport and consequently issued a Notice to Appear for two Immigration and Naturalization Act ("INA") violations.[2]

During the airport interview, the petitioner stated that she was sixteen, when in actuality her birth certificate said that she was fourteen. When asked why she sought admittance into the United States, the petitioner said, "I want to see and meet my family." (J.A. at 174.) The agents asked the petitioner if she had any fear of returning to Albania, to which the petitioner stated that she did not. (*Id*. at 175.) The petitioner admitted she used a fraudulent passport to enter the United States. (*Id*. at 174.)

On February 26, 2002, the petitioner filed an application for asylum. In the application, the petitioner alleged that she had suffered political persecution in the past because of her family's participation in democratic movements in Albania. She stated that it was clear that she was targeted to be kidnapped and forced into prostitution by the secret police, their "gangsters," and officials of the Socialist part, as punishment for her family's political activities. (*Id*. at 177-91.)

On July 22, 2002, the petitioner appeared with counsel in front of Immigration Judge Teofilo Chapa ("IJ"). At the hearing, the petitioner testified that she was born in 1987, even though in the

---

[1] The Homeland Security Act of 2002 abolished the INS and transferred its functions to the Department of Homeland Security. Pub. L. No. 107-296, 116 Stat. 2135 (2002).

[2] The Notice to Appear included violations for seeking admission into the United States through fraud and for being an alien likely to become a public charge. (J.A. at 193-94.) These violations are not at issue in the appeal because the petitioner stipulated that she was removable. (*Id*. at 174 & 46.)

airport interview she testified she was born in 1985. (*Id*. at 81 & 173.) The petitioner testified that she sought admittance into the United States because unidentified "gangsters" twice attempted to kidnap her. She stated that the first attempted kidnapping occurred in January 2001 as she walked home from school. The petitioner recalled that three men wearing masks called her to "come over" and that the kidnappers wanted to send her to Italy. She testified that when she yelled, a family nearby took her into their house and the men left. (*Id*. at 93.) The petitioner stated she thought the kidnappers wanted to force her into prostitution because she had known many girls who had been kidnapped and sent to Italy. (*Id*. at 113.)

The second incident occurred on February 10, 2001. The petitioner testified that she was walking home from school and noticed three masked men in a black Jeep fifty yards away. She stated she was frightened and "went away." (*Id*. at 101.) When the respondent asked the petitioner why she was targeted by the gangsters, she answered, "Not only me, they have done it to all the Albanian girls." (*Id*. at 123.) She stated her father wanted her to come to the United States because the elders of the city would not provide any assistance.

The petitioner further testified that after her father obtained the fraudulent passport, he made arrangements for her to take a bus to Tirane, Albania. Her father told her that once in Tirane, two strangers would take her to the airport. The strangers took her to the airport where she first flew to Italy, staying for one night. The petitioner did not seek asylum in Italy.

The petitioner's father then testified. The father stated that many girls in Tirane were kidnapped and forced into prostitution in Italy. Specifically, he said, "[t]hey wanted to kidnap my daughter to send her as a prostitute in Italy so that they could obtain money." (*Id*. at 143.) The father stated that after the two incidents, he went to Tirane and met a group of people who were

3

selling passports. He purchased the passport for $5,000. He then placed the petitioner on a public bus to Tirane and told her to meet two unknown people who would take her to the airport.

The father mentioned his political ties to the democratic party and that it was possible his entire family could die if they stayed in Albania. He said, "I've been persecuted for years and years, well, what to say about it, it's a long story, and it's really that girls get kidnapped there." When asked if the picture on the passport was his daughter's, he said that he was not sure and that he did not know from where the photograph came. (*Id*. at 161.)

The IJ held that the petitioner and her father's testimony was incredible and that the evidence did not connect any of the alleged past persecutions to the enumerated ground of relief alleged, persecution on account of political opinion. The judge specifically noted the inconsistencies in the airport interview and the petitioner's testimony at the hearing. The judge also commented on the vague testimony concerning the travel plans for her departure from Albania. The judge found it incredible that a father would place his daughter on a public bus to meet two strangers in a large city, especially when the father was aware of two alleged attempted kidnappings.[3]  (*Id*. at 50-60.)

The petitioner appealed to the BIA, which affirmed the IJ's decision denying the application for asylum. After the BIA's adverse ruling, the petitioner timely appealed to this Court, arguing only that the BIA was in error in denying her application for asylum.

## II. STANDARD OF REVIEW

The petitioner argues that the BIA's decision to deny eligibility for asylum was in error. This Court has jurisdiction to review the final decision of the BIA "affirming the IJ's denial of asylum."

---

[3] The judge also held that the petitioner failed to show a right to withholding of removal or relief pursuant to the Convention Against Torture. (*Id*. at 60.) The BIA affirmed, but the petitioner did not appeal these decisions.

4

*Singh v. Ashcroft*, 398 F.3d 396, 400 (6th Cir. 2005); 8 U.S.C. § 1252 (1999).

The INA provides that "administrative findings of fact are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(B). This statute replaced former § 1105a (a)(4) that provided that the agency's determinations must be upheld if "supported by reasonable, substantial, and probative evidence on the record considered as a whole." Prior to the enactment of § 1252, the Supreme Court stated the standard of review pursuant to § 1105a was "substantial evidence." *INS v. Elias-Zacarias*, 502 U.S. 478, 481 (1992). The Court went on to state that the BIA's determination can only be reversed "if the evidence presented ... [is] such that a reasonable factfinder would have to conclude that the requisite fear of persecution existed." *Id.* Further, the Court stated that in order to reverse, the court "must find that the evidence not only supports that conclusion, but *compels* it." *Id.* at n.1.

Even though § 1105a has been repealed, this Circuit held that § 1252(b)(4)(B) merely codifies the substantial evidence standard of review announced in *Elias-Zacarias*.[4] *Yu v. Ashcroft*, 364 F.3d 700, 702 (6th Cir. 2004) (stating that "our jurisprudence, except for reiteration of the repealed 'supported by reasonable, substantial, and probative evidence' language, remains good law"). Credibility determinations, likewise, are reviewed under the substantial evidence standard. *Id.*

---

[4] A panel of the Sixth Circuit held that the substantial evidence standard no longer applies. *Pilica v. Ashcroft*, 388 F.3d 941, 951 n.9 (6th Cir. 2004) (stating that "cases such as *Elias-Zacarias* are not valid precedent regarding the standard of review to be applied here" but still holding that the court may not reverse unless the evidence *compels* a different conclusion).

*Pilica* was decided seven months after *Yu*, but six months before *Singh*. *Singh*, the most recent asylum case that mentions the standard of review, follows *Yu* and applies the substantial evidence test announced in *Elias-Zacarias* and followed by *Yu*. *Singh,* 398 F.3d at 400-01.

Thus, "[w]e review administrative findings of fact, such as whether an alien qualifies as a refugee, under the substantial evidence standard, keeping in mind that such findings are 'conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary.'" *Singh,* 398 F.3d at 400 (*quoting Yu*, 364 F.3d at 702); *Klawitter v. INS*, 970 F.2d 149, 152 (6th Cir. 1992) (holding that "in order to reverse the BIA's factual determinations, the reviewing court must find that the evidence not only supports a contrary conclusion, but indeed *compels* it"). The appropriate question, then, "is whether the evidence 'was such that a reasonable factfinder would have to conclude that the requisite fear of persecution existed.'" *Koliada v. INS*, 259 F.3d 482, 486 (6th Cir. 2001) (*quoting Elias-Zacarias*, 502 U.S. at 481).

### III. DISCUSSION

#### A. Applicable Law on Asylum

The Attorney General has discretion to grant asylum upon determining "that such alien is a refugee." 8 U.S.C. § 1158(b)(1); *Yu,* 364 F.3d at 702; *Klawitter,* 970 F.2d at 151. A "refugee" is defined as any person "who is unable or unwilling to return to" the person's country of nationality "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42).

A two-part inquiry is utilized to determine whether to grant asylum. First, the petitioner has the burden to show that she has a well-founded fear of future persecution. Next, the petitioner must show that the situation "merits a favorable exercise of discretion" by the immigration judge. *Yu*, 364 F.3d at 702 (*quoting Ouda v. INS*, 324 F.3d 445, 451 (6th Cir. 2003)) (internal quotations omitted); *Klawitter,* 970 F.2d at 151.

In order to establish the first part of the inquiry, a well-founded fear of future persecution,

6

the petitioner must show:

> (1) that [she] has a fear of persecution in [her] home country on account of race, religion, nationality, membership in a particular social group, or political opinion; (2) that there is a reasonable possibility of suffering such persecution if [she] were to return to that country; and (3) that [she] is unable or unwilling to return to that country because of such fear.

*Pilica*, 388 F.3d at 950. Thus, a well-founded fear of future persecution has both an objective and subjective component in that "an alien must actually fear that [she] will be persecuted upon return to [her] country, and [she] must present evidence establishing an 'objective situation' under which [her] fear can be deemed reasonable." *Id.*

In lieu of the above, the petitioner may establish that she has suffered past persecution. If the petitioner proves past persecution, then she is

> presumed to have a well-founded fear of future persecution, but this presumption may be rebutted by the government if it shows by a preponderance of the evidence that conditions in the country have changed so fundamentally that the applicant no longer has a well–founded fear of persecution.

*Singh,* 398 F.3d at 401.

The petitioner's own testimony, "if credible, 'may be sufficient to sustain the burden of proof without corroboration.'" *Koliada*, 259 F.3d at 487 (*quoting* 8 C.F.R. § 208.13(a) (2001)); *Perkovic v. INS*, 33 F.3d 615, 621 (6th Cir. 1994) (stating that the petitioner can sustain the burden of proof by her testimony alone, if "the testimony is believable, consistent, and sufficiently detailed to provide a plausible and coherent account of the basis for [her] fear"). Proving "persecution ... requires more than a few isolated incidents of verbal harassment or intimidation, unaccompanied by any physical punishment, infliction of harm, or significant deprivation of liberty." *Pilica*, 388 F.3d at 950 (internal citations and quotations omitted).

If the petitioner proves either past persecution or a well-founded fear of future persecution,

7

then the petitioner must show that the situation warrants an exercise of judicial discretion to grant asylum. *Yu*, 364 F.3d at 702.

## B.    The BIA Did Not Err in Denying Asylum

The BIA held that the petitioner failed to establish eligibility for asylum because of the petitioner's credibility issues and her lack of proof tying the alleged instances of persecution to her political opinion. Because the BIA declared the petitioner ineligible for asylum, the Board did not have to reach the second part of the inquiry.

The petitioner argues that the BIA erred in not granting asylum because she testified to several instances of past persecution and was entitled to a presumption of well-founded fear of future persecution.[5] The respondent argues that the BIA's decision should be affirmed because there is substantial evidence to support the BIA's adverse credibility determination. (Resp't Br. at 17-19, 24.) The respondent also argues that the panel should affirm the BIA's decision that the petitioner failed to prove that the instances of alleged past persecution were "on account of" her political opinion. (*Id*. at 25-28.)

### 1.    Credibility Determination

It is permissible to deny an application for asylum based largely on credibility, as long as specific reasons are included that explain why a credibility determination is made. *Singh*, 398 F.3d at 402 ; *Sylla v. INS*, 388 F.3d 924, 926 (6th Cir. 2004). Further, an "adverse credibility finding must be based on issues that go to the heart of the applicant's claim. They 'cannot be based on an

---

[5] The petitioner also states that the IJ erred because the judge found the petitioner credible, but still did not utilize the presumption for past persecution. (Pet'r Br. at 9.) This argument is wholly without merit because the decision of the IJ was clearly based on an adverse credibility determination. (J.A. at 54) ("This Court, though, does not find either [the petitioner] or her father credible.").

irrelevant inconsistency.'" *Sylla*, 388 F.3d at 926 (*quoting Daneshvar v. Ashcroft*, 355 F.3d 615, 619 n.2 (6th Cir. 2004)). In fact, the discrepancies must be viewed as "attempts by the applicant to enhance [the] claims of persecution" or, otherwise, they have no relevancy. *Id.*

As the BIA did not summarily affirm or adopt the reasoning of the IJ, this Court reviews the decision of the BIA. *Compare Yu*, 364 F.3d at 702. For the credibility determination, the BIA only stated that "[t]he direct contradictions between her airport statements and her asylum claim raise questions concerning the [petitioner's] credibility." (J.A. at 4.) The BIA mentioned that the petitioner claimed she was targeted for her family's participation in democratic activism, but at the hearing testified that "all girls in Albania are at risk of abduction for prostitution" and further that "the gangsters were interested in her because they believed that she might have money because she has a sister in the United States."[6] (*Id.*) The IJ specifically noted many of the inconsistencies, and therefore those inconsistencies will be discussed below.

For example, the IJ noted that in the airport interview, the petitioner stated she entered the United States to see her family, but at the hearing, she testified she feared being kidnapped and forced into prostitution. (*Compare id.* at 174 *with* 105.) In the airport interview, the petitioner stated she was not afraid of returning to Albania and that she obtained the fraudulent passport from a man her relatives knew. (*Id.* at 175.) At the hearing, the petitioner testified that her father just happened to be in Tirane and purchased the fraudulent passport.

The inconsistencies specifically mentioned by the IJ go to the heart of the claim for asylum

---

[6] This Circuit held that inconsistencies between an asylum application and an immigration hearing impact credibility when the applicant fails to prove what she alleges in the application for asylum because such failure it casts grave doubt upon the applicant's testimony. *Pilica*, 388 F.3d at 953 (holding that "even at its most favorable, [the applicant's] live testimony did not measure up to the claims made in [the] asylum requests").

9

because the petitioner's reasoning for entering the United States is central to whether the petitioner has suffered past persecution or has a well-founded fear of future persecution.[7]

Other examples of credibility problems include the details the petitioner provided surrounding the second kidnapping attempt. The IJ noted that it was hard to believe that the petitioner saw a black Jeep, recognized the men were wearing masks, and that the license plate was missing, from over fifty yards away.

The IJ also found incredible the father's vague testimony about the events surrounding her departure. As the IJ stated, it is unbelievable that a father, who fears his daughter will be kidnapped, would send her on a public bus to meet two strangers in the middle of Tirane, without telling his daughter what the men looked like or providing more information. Based on the administrative record as a whole, a reasonable adjudicator would not be *compelled* to find the petitioner or her father credible.

### 2. Persecution Not Connected to Enumerated Grounds

There is also substantial evidence supporting the BIA's finding that the petitioner's "sketchy testimony failed to persuasively tie the purported kidnapping attempts to a protected ground for purposes of a claim for asylum." (*Id.*) In the application for asylum, the petitioner claimed she was targeted for her family's participation in democratic activism, but testified at the hearing that "all girls in Albania are at risk of abduction for prostitution" and further that "the gangsters were

---

[7] This Circuit noted in dicta that other circuits have held that airport interviews should not be the *sole* impeachment source because the interviews are unreliable due to translation and other problems. *Yu*, 364 F.3d at 703 n. 4 (avoiding the issue because the immigration judge did not make the credibility determination *solely* on statements made at the airport interview). The case at hand is similar to *Yu* because the airport interview was not the *sole* source of the IJ's credibility determination.

interested in her because they believed that she might have money because she has a sister in the United States." (*Id.*)

The father similarly testified about "gangsters" who tried to kidnap his daughter, but did not state that the particular "gangsters" had political motivations. Thus, even if the testimony of the petitioner and her father was credible, neither testified that the gangsters were motivated by an enumerated ground for asylum. *See Elias-Zacarias*, 502 U.S. at 482 (holding that the statute requires the alleged past persecution to be "on account of" one of the enumerated grounds).

## IV. CONCLUSION

For the reasons stated above, we **AFFIRM** the decision of the BIA.

**MERRITT, Circuit Judge, concurring.** I would rest our judgment on the simple fact that petitioner Nikis's statements at the airport were directly contrary to her later claim for asylum. In her airport interview, Nikis responded to the question, "Do you have any fear of returning to Albania?" by answering, "No." Furthermore, she described her reason for traveling to the U.S. as "I want to see and meet my family." Only in her written application for asylum, prepared later, did Nikis attempt to present a connection between the attempted kidnappings and her political activities. Considering these inconsistent accounts, the Immigration Judge was entitled to believe that her real motivation for seeking entry to the United States did not involve "a well founded fear of persecution," but rather a desire to see her sister. The judge was entitled to take her at her word when she said she did not have any fear of returning to Albania.

For these reasons I concur in the judgment affirming the decision of the Board of Immigration Appeals.